IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

R.P. and C.F.,

    Plaintiffs,

vs.                                                    No. 1:18-CV-01051-KWR-KK

SANTA FE PUBLIC SCHOOLS and
GARY F. GREGOR, in his individual
capacity,

    Defendants.

### DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERT, CHAROL SHAKESHAFT, AND SUPPORTING MEMORANDUM

COME NOW Defendant Santa Fe Public Schools ("SFPS"), by and through its counsel of record, Jerry A. Walz, Walz and Associates, P.C., and Defendant Gary F. Gregor, through his undersigned counsel, Martin R. Esquivel, Esq. and Katherine A. Howington, Esq. (Esquivel & Howington, LLC), and hereby submit their *Daubert* Motion to Exclude Plaintiffs' Expert, Charol Shakeshaft, from rendering opinions relating to school procedure issues. In support of their Motion, Defendants state that not only is Dr. Shakeshaft not qualified to give the opinions set forth in her expert report and testimony, but those opinions are unreliable and without foundation, and, therefore, are further inadmissible. Plaintiffs oppose the requested relief.

In further support of their Motion, Defendants state as follows:

        **I.**        **Background**

Dr. Shakeshaft opines as to SFPS' policies for sexual misconduct prevention and the reporting of sexual misconduct, as well as the hiring, training, and supervision of teachers, in a 54-

1

page report. [UMF 320, Exh. BR][1]. Dr. Shakeshaft maintained those position in her deposition testimony. Defendants will address Dr. Shakeshaft's primary opinions in this Motion. Moreover, all Dr. Shakeshaft's opinions suffer from the same deficits and should be precluded.

Dr. Shakeshaft in rendering her opinions relied upon the following history as reflected in her report, deposition, and allegations set forth in Plaintiffs' complaint.

Before teaching in New Mexico, Defendant Gregor taught in Utah for about a decade, until 1995. *Complaint* at ¶ 9; Exh BR (*Shakeshaft Expert Report* at Bates 002125) (Gregor taught in Utah from 1984-1985). Although the State of Utah filed criminal charges resulting from allegations against him as a teacher, the court dismissed the charges and he was never convicted. *Complaint* at ¶¶ 20, 25; Exh BR (*Shakeshaft Expert Report* at Bates 002125) ("'Gregor had been charged in 1995' …. A judge dismissed the charges saying they did not rise to a criminal act") (internal citation omitted). While Defendant Gregor received a reprimand when he was a teacher in Utah, the reprimand expressly stated there was no finding of immoral conduct. *Complaint* at ¶ 26.[2] Defendant Gregor then taught in Montana for the 1996-97 school year. *Complaint* at 27; Exh BR (*Shakeshaft Expert Report* at Bates 002125). There is no record of any inappropriate behavior by Defendant Gregor while he taught in Montana.

After arriving in New Mexico, Defendant Gregor taught intermittently as a substitute teacher with SFPS until May 2000. [UMF 292, Exh. BR (*Shakeshaft Expert Report* at Bates

---

[1] Defendants' Undisputed Materials Facts have been filed separately, [Doc. 139] and are incorporated herein. Further, all exhibits referenced are filed under Defendants' Combined Exhibits, [Doc. 140], and incorporated herein.

[2] Although Dr. Shakeshaft discusses this reprimand in the timeline in her expert report, *see* Exh. BR (*Shakeshaft Expert Report* at Bates 002125-26) ("17 May 1996" on Dr. Shakeshaft's timeline), she neglects to identify the express finding of a lack of immoral conduct. However, Plaintiffs acknowledge that the Utah Professional Practices Advisory Commission "'found no evidence of immoral conduct.'" *Complaint* at ¶ 26 (internal citation omitted).

002126)]. He then took a full-time teaching position with SFPS for the 2000-01 school year at Ortiz Middle School. *Complaint* at ¶ 34; UMF 294, 307; Exh. BR (*Shakeshaft Expert Report* at Bates 002126). Defendant Gregor received a negative performance evaluation at Ortiz Middle School, resulting in a recommendation not to rehire him. *Complaint* at ¶¶ 35, 36.  However, his negative performance at Ortiz Middle School did not involve inappropriate behavior or sexual misconduct, [UMF 306; Exh. BS (*Shakeshaft Dep.* at 40:8-41:4)], but was because he had poor classroom management skills. [UMF 305]. Although SFPS did not rehire Defendant Gregor to teach at Ortiz Middle School, the district employed him as a regular education teacher at Agua Fria Elementary School for the 2002-03 school year. *Complaint* at ¶ 38.[3]

In order to obtain his teaching license from the New Mexico Public Education Department ("PED"), the State of New Mexico required Defendant Gregor to pass a background check, which included a New Mexico State Police and FBI fingerprinting check. [UMF 295]. SFPS also had a policy to perform its own background checks, [UMF 296-299], which it did for Defendant Gregor in compliance with its written policy. [UMF 300].

---

[3] Dr. Shakeshaft's timeline does not identify the change of schools. *See* Exh. BR (*Shakeshaft Expert Report* at Bates 002126). Her timeline is misleading in other material aspects. Dr. Shakeshaft omits Vickie Sewing's investigation and interviews of the docents who witnessed the reported conduct on January 29, 2004 [UMF 202, 203], instead claiming the interviews did not occur until February 5 and 6, 2004. *See* Exh. BR at Bates 002128. Dr. Shakeshaft omits that the decision to place Defendant Gregor on administrative leave was made on February 2, 2004 [UMF 208], while he was notified of that decision on February 3, 2004 [UMF 209]. Dr. Shakeshaft erroneously claims that after student interviews, there was no further investigation or reporting. *See* Exh. BR (*Shakeshaft Expert Report* at Bates 002129).  However, subsequent to the student interviews, SFPS met with Plaintiffs' parents [UMF 223-225] and facilitated an investigation by the Santa Fe Rape Crisis Center, *See* Exh. Y, and also reported to the Public Education Department (PED), regarding Gregor's conduct, [UMF 229] and PED issued a notice of reprimand. [UMF 210].

Although Dr. Shakeshaft does not explicitly set forth the training policies in her expert report, she acknowledged in her testimony that sexual misconduct training took place.  Exh. BS (*Shakeshaft Dep.* at 44:9-45:18).

In addition to its screening policy, SFPS also had policies requiring employees to complete sexual harassment and child abuse prevention training, [UMF 302], which Defendant Gregor successfully completed prior to teaching at SFPS on a full-time basis. [UMF 303].

Dr. Shakeshaft ignored this evidence that was contained in Defendant Gregor's personnel file and produced in discovery here, testifying instead that she "did not have access to anything" to show that a criminal fingerprint check was performed that came back negative for felony arrests or convictions.  Exh. BS (*Shakeshaft Dep.* at 28:13-18).  However, the evidence is undisputed that a criminal background check was performed on Defendant Gregor and it returned no felony arrests or convictions. [UMF 295, 296] During the 2003-04 school year, Defendant Gregor allegedly had inappropriate contact with Plaintiffs at a public facility, The International Folk Art Museum.  Although Plaintiffs never reported Defendant Gregor's alleged abuse as fourth graders, a third-party reported inappropriate conduct that SFPS investigated, as follows.

On Tuesday, January 27, 2004, Defendant Gregor accompanied his class on a field trip to the Museum of International Folk Art.  *Complaint* at ¶ 141.  On Wednesday, January 28, 2004, the Museum's Director of Education notified Principal Sewing that two Museum docents had observed students sitting on Defendant Gregor's lap.  *Id.* at ¶¶ 141, 142.  <u>Neither Plaintiffs nor Dr. Shakeshaft were able to identify a single instance in which SFPS received a complaint of inappropriate touching prior to hearing from the Museum</u>.

Upon receiving the report from Aurelia Gomez, the Museum's Director of Education, on Wednesday, January 28, 2004, Principal Sewing reported the allegations to SFPS' Chief Human

4

Resources Officer, Diane Sparago the next day, on Thursday, January 29, 2004, and personally interviewed both docents, Judy Laughlin and Lois Callaghan that same day about what they had observed. [UMF 199, 200, 203, 204]. Principal Sewing reported the information she learned from the docents to SFPS' Chief Human Resources Officer, Diane Sparago on Friday, January 30, 2004. [UMF 206]. Dr. Shakeshaft does not reference Principal Sewing's investigation or report in her timeline, although she acknowledges the investigation in her testimony. Exh. BS (*Shakeshaft Dep.* at 55:8-18; 56:24-57:24).

On Monday, February 2, 2004, just three days after learning about the allegations at the Museum, SFPS decided to place Dr. Gregor on administrative leave. [UMF 208]. The very next day, on Tuesday, February 3, 2004, SFPS removed Defendant Gregor from his classroom and notified him that he had been placed on administrative leave [UMF 209]. Defendant Gregor never returned to the classroom or employment at SFPS. [UMF 210]. Although Dr. Shakeshaft does not expressly acknowledge in her timeline SFPS' removal of Defendant Gregor from the classroom or the fact that he never returned to the classroom, it is implicit in her expert report, which contains no note of Defendant Gregor ever returning to the classroom after SFPS placed him on administrative leave.

Even though Principal Sewing had already investigated the docents' allegations, after removing Defendant Gregor from the classroom, Principal Sewing, along with a human resources officer, performed an ongoing investigation by speaking with the students in his classroom, including Plaintiffs. [UMF 211-216]. Principal Sewing, who had a background working for the Santa Fe Rape Crisis Center, which involved teaching children in schools about "good touch/bad touch," [UMF 196, 197], believed that the actions of Defendant Gregor, although "well beyond

5

that in which a teacher should engage," did not rise to the level of child abuse or criminal sexual contact under the law.  [UMF 218].

Therefore, SFPS policy did not require Principal Sewing to report his reported conduct to CYFD or law enforcement. [UMF 312, 313]; Exh. BS (*Shakeshaft Report* at Bates 002160) (emphasizing sexual misconduct policy that differentiates sexual misconduct, requiring reporting to a supervisor, with abuse, requiring reporting to authorities).  Nonetheless, SFPS reported the allegations and the results of its investigation to the PED. [UMF 229].  As set forth in the following analysis, Dr. Shakeshaft conflates sexual misconduct with sexual abuse in her opinions, as well as the reporting requirements for each.  Sexual misconduct is differentiated from sexual abuse in SFPS' policies, as well as the law.  While Dr. Shakeshaft characterizes the grooming conduct and inappropriate touching by Defendant Gregor as sexual abuse, that characterization is contrary to the law at the time.

As set forth below, Dr. Shakeshaft's opinions based on the above-cited topics are inadmissible because not only is she unqualified to render them, but because they lack any foundational support or underlying methodology that would make them reliable.

## II. Legal Standard

Fed. R. Evid. 702 governs the admissibility of expert opinion testimony.  It requires in part that a witness be qualified as an expert by knowledge, skill, experience, training, or education and that the expert's scientific, technical, or specialized knowledge will help the jury understand the evidence or determine a fact in issue.  Trial courts are responsible to make certain that expert testimony will assist the jury in understanding the evidence and in determining the factual issues it must decide.  *United States v. Ganadonegro,* 805 F. Supp. 2d 1188, 1196 (D. N.M. 2011).  Accordingly, not only must the trial court decide whether an expert is qualified to testify, but under

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the trial court must also determine whether the expert's opinion testimony is the product of reliable methodology. *Id.* More specifically, *Daubert v. Merrell Dow Pharmaceuticals, Inc.* requires a court, in its role as gatekeeper, to scrutinize the proffered expert's reasoning to determine if it is sound. *Id.*

The Supreme Court articulated a non-exclusive list of factors that weigh into a trial court's reliability determination, including (1) whether the method has been tested, (2) whether the method has been published and subject to peer review, (3) the error rate, (4) the existence of standards, and (5) whether the expert's method is generally accepted as reliable in the relevant professional community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95 (1993). Although *Daubert* involved scientific testimony, the case of *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-51 (1999), extended the *Daubert* factors to skill or experience based observation. *See also United States v. Adams,* 271 F.3d 1236, 1245 (10th Cir. 2001) (Rule 702 imposes a special obligation upon a trial judge to ensure that all expert testimony, even non-scientific and experience-based expert testimony, is both relevant and reliable).

Even once reliability is established the trial court nonetheless still needs to determine whether the expert's testimony will be helpful to the trier of fact. *United States v. Rodriguez-Felix,* 450 F.3d 1117, 1123 (10th Cir. 2006); *Ganadonegro,* 805 F. Supp. at 1199. In making this determination, the court considers the jurors' common knowledge and experience and whether the expert's testimony would usurp the jury's primary role as the evaluator of evidence. *Id.*

The burden rests upon the party seeking to present the expert testimony to establish admissibility by a preponderance of the evidence. *McClain v. Metabolife Intern., Inc.,* 401 F.3d 1233, 1237 (11th Cir. 2005); *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)

(holding that a party proffering expert testimony must show the expert's methodology is scientifically sound).

Dr. Shakeshaft's opinions fail to meet the above standards for admissibility, and she should be precluded from rendering her expert opinions in this proceeding.

### A. Dr. Shakeshaft is not qualified

Plaintiffs offer Dr. Shakeshaft's opinions in the area of school procedures.  [UMF 319]. Importantly, Dr. Shakeshaft has never been a licensed public-school teacher, has never been a public school administrator, and has never worked in human resources in a public school setting. [UMF 322]. Moreover, Dr. Shakeshaft is unfamiliar with New Mexico law applicable to school personnel issues during the time period relevant to this lawsuit [UMF 323], and, in fact, did not even look at SFPS' hiring practices outside of its hiring of Defendant Gregor in order to form her opinions.  [UMF 324].  Dr. Shakeshaft has never conducted a sexual misconduct investigation in a public school, Exh. BS at 60:3-5; 63:6-10, has never held any public school professional licenses or certifications, Exh. BS at 74:25-75:6, and has never opined on a defendant's behalf in at least the past five years.  Exh. BS at 68:7-69:17.  Dr. Shakeshaft has no independent knowledge of the laws or administrative standards that governed New Mexico's public schools or of SFPS' at the time Defendant Gregor was hired and has no knowledge or experience relating to whether or not SFPS took appropriate actions when it was learned for the first and only time that Defendant Gregor had what appeared to be inappropriate contact with students as reported by the docents. Once reported to Principal Sewing, swift and competent action was taken.

The significant shortcomings in Dr. Shakeshaft's qualifications result in opinions that are contrary to the applicable law at the time of SFPS' dealings with Defendant Gregor.  For example, she opined that SFPS' "partial and incomplete reporting … allowed Gregor to continue his

8

abuses." Exh. BR (*Shakeshaft Expert Report* at Bates 002169).  Dr. Shakeshaft identifies this "partial and incomplete reporting" as the failure to report the allegations against Defendant Gregor to CYFD or to law enforcement. *Id.* at Bates 002160-61.  However, SFPS' policies required the reporting of abuse to authorities, not the reporting of misconduct that did not rise to the level of abuse. [UMF 312, 313].  Dr. Shakeshaft has pointed to no legal duty for school officials to report alleged inappropriate misconduct as reported by the museum director and docents, and as disclosed by students interviewed [UMF 215] to the police, rather than abuse.   Dr. Shakeshaft justifies her opinion that SFPS should have reported Defendant Gregor's conduct to authorities by Dr. Shakeshaft's characterizing it as sexual abuse rather than describing the facts as reported.  *See, e.g.,* Exh. BR (*Shakeshaft Expert Report* at Bates 002169) (last paragraph summarizing all findings and opinions pertains to sexual abuse).

Principal Sewing's analysis at the time,  on the other hand, that the reported allegations as provided to her as a result of the investigation against Defendant Gregor did not rise to the level of sexual abuse or child abuse, was consistent with the law that then existed.  NMSA 1978, § 32A-4-2(G) (1999) defined "sexual abuse" as including "criminal sexual contact, incest or criminal sexual penetration, as those acts are defined by state law."  NMSA 1978, § 30-9-13 (2003), defined criminal sexual contact of a minor as "the unlawful and intentional touching … the intimate parts of a minor," defining "intimate parts" to mean the "primary genital area, groin, buttocks, anus or breast."   None of the allegations against Defendant Gregor that Principal Sewing or any representative from SPFS learned about fell within this definition.

 NMSA 1978, § 32A-4-2(B) (1999) defined an "abused child" as a child who has suffered harm by the child's parent, guardian, or custodian.  NMSA 1978, § 32A-1-4(E) (2003) defined "custodian" as a person who exercises physical control, care, or custody of the child, like an

employee of a residential facility. Further, to be an abused child, a parent, guardian, or somebody with whom the child lived would have to had harmed that child. "<u>Custodian" did not include a teacher, and, in fact, the statutory provision was amended in 2005 to define "custodian" as "an adult with whom the child lives who is not a parent or guardian of the child.</u>" NMSA 1978, § 32-1-4(E) (2005) (emphasis supplied). Because Defendant Gregor was not the parent, guardian, or custodian of any of the students, and his actions towards his students did not constitute child abuse under the law. Again, it is important in context that neither C.F., R.P., or any other students provided information that would clearly constitute criminal allegations which would have triggered a law enforcement and/or CYFD investigation or both.

Further, the case law considering whether grooming and touching constituted sexual abuse such that a plaintiff could state a civil rights claim found that the type of conduct reported to SFPS did not rise to the level of actionable sexual abuse. For example, in *Jojola v. Chavez,* 55 F.3d 488, 490-91 (10th Cir. 1995), a complaint that the school custodian was watching girls in the locker room, rumors about improper sexual behavior by the custodian, a complaint about his inappropriate sexual comments, the removal of the custodian from his former position as a school bus driver because of inappropriate behavior with a female student, and unhooking junior high school students' bras, were insufficient to meet the actual notice requirement of a pattern of sexual abuse. In other words, the court did not find that the alleged acts by the custodian constituted sexual abuse as required to invoke the substantive protections of the due process clause. Likewise, in *Sh.A. v. Tucumcari Publ. Schs.,* 2001 WL 37124874, * 4, 9, No. 00-cv-727 JP/DJS (D.N.M. Oct. 17, 2001), *affirmed on other grounds*, 321 F.3d 1285 (10th Cir. 2003), the court found that the following conduct did not constitute sexual abuse necessary to state a § 1983 claim under the substantive due process clause: a teacher rubbing students' backs and chests underneath their

shirts and running his hand underneath their shorts from their knees up to their thighs, almost to the point where the leg met the body.

Dr. Shakeshaft found that SFPS' reporting policies "were stated clearly and emphatically." Exh. BR (*Shakeshaft Report* at Bates 002160).  She emphasized the policy's reporting guidelines, requiring sexual misconduct to be reported to a supervisor, *id.,* which is exactly what Principal Vickie Sewing did, as set forth above, and requiring abuse to be reported to the authorities.  *Id.* However, as set forth in the above-cited statutes and case law that was then applicable, the one instance from the museum trip of reported allegations against Defendant Gregor did not constitute sexual abuse.

Dr. Shakeshaft's lack of familiarity with New Mexico law about what then constituted sexual abuse at the time led to an unfounded opinion about SFPS' duty to report that is unreliable. Although she did not criticize SFPS' different reporting requirements for sexual misconduct versus sexual abuse, she conflated misconduct and abuse in rendering her opinions making those opinions unreliable and misleading.

Dr. Shakeshaft's opinions about SFPS' reporting policies are not the only ones that suffer from a lack of foundational knowledge.  Without knowledge of the law governing SFPS' duties regarding hiring, investigation, reporting, or training, Dr. Shakeshaft does not have the qualifications to opine as to whether SFPS' policies were consistent with their legal obligations or whether SFPS breached any standard of care in the implementation or enforcement of their policies.  Therefore, those opinions should also be precluded.

**B.  Dr. Shakeshaft's opinions are unreliable, and, therefore inadmissible**

While Dr. Shakeshaft's lack of qualifications in the field of public education and knowledge of New Mexico law are significant, her lack of any reliable methodology for rendering

those opinions presents additional concerns. For example, not only is she unaware of the legal standards that existed at the relevant time or their impact on the policies or practices of SFPS, but she also identifies alleged deficiencies with SFPS' policies without referencing any relevant guidelines, making it impossible to determine how SFPS' policies failed to meet applicable guidelines. For example, Dr. Shakeshaft's report has charts comparing her model expectations and SFPS' actual policies. *See, e.g.* Exh. BR (*Shakeshaft Report* at Bates 002150-51). However, she fails to cite or reference the source of these model expectations. Moreover, her "expectations" here differ from the practices she advocated for in a report she authored for the U.S. Department of Education in 2004, set forth in a document titled Educator Sexual Misconduct: A Synthesis of Existing Literature [Exh. BV].

For example, the standard Dr. Shakeshaft set forth for hiring practices in 2004 in her submission was simply that "[a] common form should be used for all applications which includes questions on work history, identification that will facilitate background checks, and all information on criminal history. The form should include a statement that incomplete or false information can result in termination. Interviewers should be trained to identify red flags in applicant backgrounds." Exh. BV (*Educator Sexual Misconduct* at 47). However, Dr. Shakeshaft's opinion here about what questions should be included on an employment application, Exh. BR (*Shakeshaft Report* at Bates Agua Fria 002150), is different than what she identified in 2004. There are no references for her expectations here that account for the differences between the standards she espoused in 2004 versus those she espouses here. Without referencing the basis for her expectations here, it is impossible to determine whether those expectations are based on anything other than Dr. Shakeshaft's subjective beliefs, which evidence shows have morphed over time.

Likewise, Dr. Shakeshaft advised school districts in 2004 to investigate sexual abuse allegations and then to report the allegations to law enforcement, Exh. BV at 48-49, while opining here that SFPS should not have conducted its own investigation because it was not qualified to do so and should have left the authorities to investigate. Exh. BS (*Shakeshaft Dep.* p. 60:22-61:7).

Because of her total lack of experience in the field of public education, no licensures, and a very limited amount of teaching experience in private education, the methodology utilized by Dr. Shakeshaft in the formulation of her opinions becomes very important as *Daubert* and Rule 702 would require opinions rendered on more than a subjective belief and personal judgments.

When an expert eschews reliance on rigorous methodology and purports to base an opinion merely on experience or training, a court should look at whether the opinion is supported by a review of experimental, statistical, or data generated by others in the field. *U.S. v. Frazier,* 387 F.3d 1244, 1262 (11th Cir. 2004); *Clark v. Takata Corp.,* 192 F.3d 750, 758 (7th Cir. 1999). Nothing set forth in Rule 702 or *Daubert* requires a district court to admit opinion evidence based only on an assertion by an expert without proof. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). In fact, the Advisory Committee Notes to the 2000 Amendments to Rule 702 state:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'

Plaintiffs cannot establish that Dr. Shakeshaft has reliably applied her experience to the facts here. Her opinions cannot be tested, they cannot be analyzed for error, and it is unclear if they are even accepted within the educational community given that she does not cite any professional or educational standard for the basis of her policy expectations and statement that "screening will not identify the majority of educators who have or will sexually abuse," and that school districts should conduct screenings not necessarily to try and determine whether a teacher

has a history of sexual abuse, but just to show a school's "seriousness," lends itself to the conclusion that even had SFPS maintained inadequate policies or improperly screened Defendant Gregor, that would not have been the cause of any harm.

In summary, the record shows that Dr. Shakeshaft's opinions here are subjective. Her opinions cannot be tested, they cannot be analyzed for error, and she identifies no professional, educational, legal or other standard that forms the basis of her policy expectations. Therefore, there is nothing to establish the reliability of her opinions, making them inadmissible under *Daubert* and Rule 702 standards.

Further, her very limited actual teaching experience in a private school coupled with the facts that she has never taught in or been a licensed teacher or administrator in a public school, has never conducted a public school investigation for sexual misconduct, has never employed and/or hired a teacher or administrator, [UMF 322], also makes her unqualified to render expert opinions.

### C. Even if Dr. Shakeshaft's opinions are admissible under Rule 702, the Court should exclude them because they are unfairly prejudicial, confuse the issues, and would tend to mislead the jury

Even if Dr. Shakeshaft's opinions are otherwise admissible, expert testimony, like any other evidence, may be excluded if it fails Fed.R.Evid. 403's balancing test. *See Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994). Therefore, if the probative value of the expert's testimony would be substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury, the court may exclude it. *See id.* As set forth above and in the summary of her opinions, Dr. Shakeshaft's expert report and all her testimonial opinions are premised on her characterization of the reported allegations against Defendant Gregor as sexual abuse, rather than sexual misconduct. However, given that the statutes, common law, and SFPS' policies all differentiated at the time between sexual misconduct and sexual abuse, and because

the reported allegations made to SFPS against Defendant Gregor did not legally rise to the level of sexual or child abuse, Dr. Shakeshaft's characterization of the reported behavior as sexual abuse has improper and inaccurate legal implications.

Notably, Dr. Shakeshaft frames her opinions in the context of an incorrect legal premise which is misleading, at best. Her constant equating of the reported behavior to sexual abuse is unduly prejudicial to Defendants and confuses the issues. If Plaintiffs' expert cannot differentiate between grooming behavior and defined sexual abuse, or if she believes that some grooming behavior is sexual abuse *per se* despite legal authority to the contrary, then repeating this faulty premise to the jury in the context of her opinions obscures the distinction for the jury, a distinction which directs SFPS' obligations here.

### IV. Conclusion

Dr. Shakeshaft is not qualified to render expert opinions as to the propriety of SFPS' policies and procedures or its implementation or enforcement of them. Dr. Shakeshaft's deficiencies in public education have been well noted here. Dr. Shakeshaft cannot identify a methodology based on her lack of experience and was unfamiliar with New Mexico Law. Even if her opinions were otherwise admissible, Dr. Shakeshaft's opinions are misleading, confusing, and prejudicial because she conflates sexual misconduct with sexual abuse, which are legally distinct behaviors to which different obligations attach. Accordingly, the Court should exclude Dr. Shakeshaft's opinions.

WHEREFORE, Defendants respectfully request the Court to grant their Motion, to exclude Dr. Shakeshaft's opinions and testimony, and for such further relief as the Court deems appropriate.

Respectfully submitted,

WALZ AND ASSOCIATES, P.C.

*/s/ Jerry A. Walz*
JERRY A. WALZ, ESQ.
*Attorney for Defendant Santa Fe Public Schools*
133 Eubank Blvd NE
Albuquerque, NM 87123
(505) 275-1800
jerryawalz@walzandassociates.com

ESQUIVEL & HOWINGTON, LLC

*/s/*
MARTIN R. ESQUIVEL, ESQ.
KATHERINE A. HOWINGTON, ESQ.
*Attorneys for Defendant Gary F. Gregor*
111 Lomas NW, Suite 203
Albuquerque, NM 87102
(505) 933-6880
mesquivel@esqlawnm.com
khowington@esqlawnm.com

**CERTIFICATE OF SERVICE**

I HEREBY certify that on the 21st day of August 2020, I filed the foregoing electronically through the Court's electronic filing system (CM/ECF), which caused all parties or counsel of record to be served by electronic means.

*/s/ Jerry A. Walz*
JERRY A. WALZ, ESQ.