## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

R.P. and C.F.,

      Plaintiffs,

vs.

                              Case No. 1:18-cv-01051-KWR-KK

THE SANTA FE PUBLIC SCHOOLS;
And GARY F. GREGOR, in his individual capacity;

      Defendants.

**PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS'
*DAUBERT* MOTIONS SEEKING TO EXCLUDE THE TESTIMONY OF
PLAINTIFFS' EXPERTS DR. CHAROL SHAKESHAFT (DOC. 146),
DR. BARBARA HAMM (DOC. 147) AND DR. MARGARET LANCA ( DOC. 148)**

COME NOW Plaintiffs R.P. and  C.F., by and through the undersigned counsel, Carolyn

M. "Cammie" Nichols, Alicia C. Lopez, and Maggie H. Lane of Rothstein Donatelli LLP, and

hereby submit the following omnibus response to *Defendants' Daubert Motion to Exclude

Plaintiffs' Expert, Charol Shakeshaft, and Supporting Memorandum* (Doc. 146), *Defendants'

Daubert Motion to Exclude Plaintiff's Expert, Barbara Hamm, and Supporting Memorandum*

(Doc. 147), and *Defendants' Daubert Motion to Exclude Plaintiff's Expert, Margaret Lanca, and

Supporting Memorandum* (Doc. 148).  Below, Plaintiffs take up in turn each of the arguments

proffered by Defendants in seeking to exclude Plaintiffs' experts, each of whom is eminently

qualified in her field.

**LEGAL STANDARD**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  Under Rule 702, a witness may testify as an expert "in the form of an opinion or otherwise" if (1) the witness is qualified as an expert by "knowledge, skill, experience, training or education"; (2) the witness' methodology in rendering the opinion is reliable; and (3) the witness' "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  *See* Fed. R. Evid. 702.  The standard for admissibility built into Rule 702 is modeled after the United States Supreme Court's landmark ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), in which the Supreme Court held that the then prevailing *Frye* "general acceptance" standard[1] for admitting expert testimony was overly restrictive and inconsistent with the liberal thrust and preference for admissibility embodied by the Federal Rules of Evidence.  *Id*. at 588-89.  In displacing the *Frye* standard, the Supreme Court emphasized the trial judge's gatekeeping function under Rule 702 in determining whether the expert testimony at issue is relevant, reliable and helpful to the jury.

In exercising its gatekeeping function, the trial court has wide latitude in selecting and applying any factors that it deems relevant in assessing the reliability and helpfulness of the proffered testimony.  *See Kumho Tire Co., LTD*., 526 U.S. 137, 151 (holding that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").  Regardless of the criteria that the court selects, the touchstone of the reliability inquiry is to ensure simply that the expert possesses "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest

---

[1] Under the *Frye* standard, expert testimony would be admitted if "the thing from which the deduction is made [is] sufficiently established to have gained general acceptance in the particular field in which it belongs."  293 F. 1013 (D.C. Cir. 1923).

on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise*

*Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir. 2004).  The four-part

standard articulated by the Supreme Court in *Daubert* cannot be cleanly applied in every case.

In fact, concerning the application of *Daubert* factors to the "soft" sciences, this district has

observed that "courts repeatedly have indicated that *Daubert* may not apply at all, particularly in

the field of a 'soft science[ ],'" which includes psychology. *Couture v. Bd. of Educ. of*

*Albuquerque Pub. Sch.*, No. CV 05-972 JCH/DJS, 2007 WL 9734358, at *9 (D.N.M. Mar. 28,

2007).  This district has also observed that other factors a court may consider are:

> (1) whether the experts are proposing to testify about matters growing naturally
> and directly out of research they have conducted independent of litigation or
> whether they have developed their opinions expressly for the purpose of
> testifying; (2) whether the expert has unjustifiably extrapolated from an accepted
> premise to an unfounded conclusion; (3) whether the expert has adequately
> accounted for obvious alternative explanations; (4) whether the expert is being as
> careful as he or she would be in his or her regular professional work outside
> litigation consultation; and (5) whether the field of expertise claimed by the expert
> is known to reach reliable results for the type of opinion the expert intends to
> give.

*Id.* (discussing factors outlined by the Advisory Committee to the 2000 Amendments to Rule

702). Expert opinions in the area of soft science "may be based on education, training and

experience, combined with reliance on reports, depositions or other information related to the

particular circumstances," and "indicia of reliability can include professional experience,

education, training, and observations rather than research, theories and opinions."  *Bevan v.*

*Valencia*, No. CV 15-0073 KG/SCY, 2018 WL 3187356, at *3 (D.N.M. June 28, 2018) (internal

quotation marks, citations and alterations omitted).

      Given the highly variable nature of expert testimony, the Supreme Court has made clear

that lower courts should err on the side of admissibility and that "[v]igorous cross-examination,

presentation of contrary evidence and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509
U.S. at 596. Courts within this district have further noted that "the rejection of expert testimony
is the exception rather than the rule;" that *Daubert* "did not work a "sea change over federal
evidence law;" and that "the trial court's role as gatekeeper is not intended to serve as a
replacement for the adversary system." *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, No.
CV 05-972 JCH/DJS, 2007 WL 9734358, at *5 (D.N.M. Mar. 28, 2007) (quoting Fed. R. Evid.
702, Advisory Comm. Notes (2000 Amends.) (internal quotation marks omitted). When
assessing the factual bases for expert opinions, the Tenth Circuit has "taken a cautious
approach," noting that it is not the role of a judge to second-guess highly trained experts.
*Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 2007 WL 9734358, at *9 (quoting *Goebel*,
346 F.3d at 993-94) (internal quotation marks, citations, and alterations omitted).

In rendering an opinion, an expert witness may consider any information of which she
has been made aware or personally observed. *See* Fed. R. Evid. 703. Additionally, an expert
may base her opinion on any other facts or data, as long as experts in the relevant field would
reasonably rely on the facts or data in rendering an opinion on the subject. *See id*. While the
facts or data upon which an expert reasonably relies need not be admissible to be shared with the
factfinder in support of the expert's testimony, the proponent may not disclose them to the
factfinder unless their probative value substantially outweighs their prejudicial effect. *See id.*

## I.    DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERT, CHAROL SHAKESHAFT, AND SUPPORTING MEMORANDUM (DOC. 146)

Plaintiffs offer the expert opinion of Dr. Charol Shakeshaft as to the sufficiency of
Defendant SFPS' practices, policies, procedures, and employee handbooks regarding training,
prevention, detection, reporting, and investigation of sexual abuse. Dr. Shakeshaft is a professor
in the Department of Educational Leadership at Virginia Commonwealth University. She holds

4

a Ph.D. in educational administration and has "served for the past 40 years as a professor of educational administration, working with school administrators and future school administrators." (Exhibit 1at 2118 (Shakeshaft Report); *see also id.* at 1425-56 (Shakeshaft CV)). In their motion, Defendants allege variously that Dr. Shakeshaft is not qualified to render an expert opinion in this case because (1) she "has never been a licensed public-school teacher, has never been a public school administrator, and has never worked in human resources in a public school setting"; (2) her report purportedly contains minor technical inaccuracies; and (3) her opinions do not dovetail with Defendants' characterization of New Mexico law. (Doc. 146 at 8-14). Defendants further challenge Dr. Shakeshaft's methodology on the basis that she does not provide a source for her expectations as to adequate hiring practices. *Id.* at 13-14. Plaintiffs take up each of these arguments in turn.

A.    **Dr. Shakeshaft's Qualifications are Unimpeachable**

Defendants do not offer any meaningful challenge to Dr. Shakeshaft's qualifications to testify in the instant case. In addition to the above-noted bona fides, Dr. Shakeshaft began "studying sexual abuse of students in schools in the 1980s," has been the recipient of three separate grants from the U.S. Department of Education (DOE) and has authored over 200 articles and papers. (Exhibit 1 at 2118). Her decades of experience in the field led DOE to select her to author a Congressionally-mandated report on educator sexual misconduct in U.S. schools – the culmination of a four-year study – that was published by DOE and presented to Congress in 2004. *Id.* Her peer-reviewed research on the appropriate standard of care for the prevention of educator sexual misconduct has provided the standard used by organizations such as the National Association of Independent Schools and The Association of Boarding Schools in developing strategies for preventing sexual abuse of their students. *Id.*

Of equal significance, while she has testified in dozens of cases,[2] Dr. Shakeshaft has never been the subject of a successful *Daubert* challenge, including those posed on precisely this basis.  In *Doe YZ v. Shattuck-St. Mary's School*, 214 F.Supp.3d 763, 780-81 (D. Minn. 2016), for one, the trial court rejected the defendants' argument that Shakeshaft was not qualified to offer the opinions in her report because of her lack of experience as a "school administrator."   Rather, the court cited Dr. Shakeshaft's "extensive background in studying educator sexual abuse [and] misconduct" and long experience in "assisting schools to respond to allegations against teachers and developing policies and procedures to prevent [sexual] misconduct," as qualifying her as "an expert in the field of educator sexual abuse or misconduct."  *Id.; see also John Doe No. 93 v. Charter Schools USA, Inc., et al.*, No. 12-25666 CA 08 (Fla. 11th Cir. Ct. 2014).  The situation is no different here, and Defendants do not proffer a single reason why any individual with experience working as a public school educator would be better qualified to offer an expert opinion in this case than one of the nation's foremost experts on the prevention, detection, reporting, and investigation of educator sexual abuse.  *See also* Exhibit 2, *at* 10/29/18 Shakeshaft Dep. at 105:15-106:1 (Dr. Shakeshaft confirming at her deposition in a related case that her not having a history as a public school teacher was at no point an issue of concern for the federal government in selecting her to prepare a report for Congress on sexual misconduct by public school employees).

### B.    What Defendants Label as Inaccuracies or Omissions in Dr. Shakeshaft's Report Are Disputed Facts That Go to the Credibility, Not the Admissibility, of Her Testimony

Although not organized in a coherent fashion, Defendants' motion contains scattered references to supposed omissions and inaccuracies in Dr. Shakeshaft's report, which Defendants

---

[2] Exhibit 3, 4/6/20 Shakeshaft Dep. at 79:6-79:11 (Dr. Shakeshaft testifying that she has testified as an expert "in dozens of cases of this type").

suggest (without citing any authority) render her unqualified to testify in this case.  The vast majority of these alleged inaccuracies are actually disputed material facts regarding the extent of SFPS' knowledge of Defendant Gregor's inappropriate behavior with children before receiving a direct report of Defendant Gregor's touching Plaintiffs inappropriately during a museum field trip, in full view of museum docents, and the steps it took and failed to take in the wake of that report.  *See, e.g.,* Doc. 146 at 4 (Defendants claiming that Plaintiffs and Dr. Shakeshaft have been unable "to identify a single instance in which SFPS received a complaint of inappropriate touching prior to hearing from the museum" – an assertion disputed by Plaintiffs); *id.* at 3 n.3 (Defendants claiming that, contrary to Shakeshaft's report, SFPS Principal Vickie Sewing "met with Plaintiffs' parents" after discovering Defendant Gregor's sexual misconduct against them — though Plaintiffs strenuously deny that such a meeting ever occurred).  Defendants further complain that Dr. Shakeshaft's opinions are inadmissible because she "did not even look at" SFPS' "hiring practices" with respect to employees other than Defendant Gregor in forming her opinions.  *Id.* at 8.

Against these so-called inaccuracies and deficiencies, Dr. Shakeshaft's report sets forth how her review of the pertinent documents in this case encompassed the pleadings; interrogatories; deposition transcripts; expert reports in prior related cases; teacher observation and evaluation reports concerning Gregor; notes and written reports documenting Principal Vickie Sewing's conversations with the museum docents who reported Gregor's disturbing behavior toward Plaintiffs; numerous administrative documents and personnel records; records regarding interviews of Gregor's students; reports related to a presentation given to Gregor's students by Project Aware, following his leave, and the students' additional reporting in its aftermath; records relating to Gregor's dismissal from employment and a criminal case against

him in Utah; NASDTEC Clearinghouse reports on Gregor; a PED reprimand of Gregor;

investigation reports concerning other predator teachers in SFPS; and pertinent SFPS policies.

(Exhibit 1 at 5-8).  Significantly, Defendants do not even attempt to establish how Dr.

Shakeshaft's declining to accept Defendants' disputed factual account or to review the personnel

files of teachers other than Defendant Gregor means that her opinions are insufficiently factually

supported, in light of the evidence on which her opinions are actually based.

Defendants are, of course, free to attack any perceived deficiencies in Dr. Shakeshaft's

report through cross-examination or the introduction of their own expert evidence at trial – as the

presence of any such deficiencies goes to the weight to be afforded to an expert's opinion, not its

admissibility.  *See Compton v. Subaru of Am., Inc.,* 82 F.3d 1513, 1518 (10th Cir. 1996) (stating

that if there is a logical basis for an expert's opinion, the weaknesses in the underpinnings of the

opinion go to the weight and not the admissibility of the testimony), *overruled on other grounds*

*by Kumho Tire Co*., 526 U.S. at 147, 149; *see also Daubert*, 509 U.S. at 596 (noting how "the

traditional and appropriate means" of an opponent's attacking admissible expert evidence is

through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof"); *Doe YZ,* 214 F.Supp.3d at 781 (describing how Shakeshaft's

"description of the case is supported by the record, and the minor factual inaccuracies identified

by [the defendant] go to credibility, rather than admissibility, of her testimony").

### C.    Defendants' Argument That Dr. Shakeshaft Misstates the Governing Law is Both Legally Incorrect and Irrelevant

The bulk of Defendants' motion is devoted to the argument that Dr. Shakeshaft is

unqualified to testify in this case because her opinions are "contrary to the applicable law at the

time of SFPS' dealings with Defendant Gregor."  (Doc. 146 at 8).  Specifically, they complain

about her assertion that Defendant Gregor's abuse of students continued after the events in issue

because of SFPS' "partial and incomplete reporting" – namely, the failure of SFPS actors, including Principal Sewing — to report Gregor's misconduct to law enforcement or CYFD.  *Id.* According to Defendants, Dr. Shakeshaft's opinion is contrary to the governing law, because she does not acknowledge that SFPS policies in place at the time required only the reporting of a student's "abuse" to law enforcement, while Gregor's known conduct did not rise to that level. *See* Doc. 146 at 9 (Defendants arguing that NMSA 1978 § 32A-4-2(G) defined "sexual abuse" as including "criminal sexual contact" and that NMSA 1978 § 30-9-13 defined "criminal sexual contact of a minor" as "the intentional touching" of a minor's "intimate parts," including her "primary genital area, groin, buttocks, anus or breast" and that SFPS did not receive allegations that "fell within this definition").  Incredibly, Defendants even suggest that neither Plaintiff could have been an "abused child" within the meaning of New Mexico law, because Gregor was neither girl's "custodian."  (Doc. 146 at 9) (citing NMSA 1978 § 32A-4-3(B); § 32A-1-4(E)).

Interestingly, Defendants note that SFPS' policies in place at the time "differentiated … between sexual misconduct and sexual abuse." (Doc. 146 at 14).  However, SFPS responded to Plaintiffs' First Set of Written Discovery -- which requested production of SFPS' "Policy Manual in effect at the time of the alleged incidents forming the basis of the claims in this case during the 2003-2004 school year" – with the statement that "the 2003-2004 Policy Manual and Code of Ethics are no longer available." (Exhibit 4, Defendant's 12/11/19 Discovery Responses at 1).

In any event, Defendants greatly minimize the allegations against Gregor.  As Dr. Shakeshaft reports, Principal Sewing received firsthand reports from museum docents of Gregor's "fondling girls" during a trip to the International Folk Art Museum.  (Exhibit 1 at 2127).  Following interviews of the children in Gregor's class by SFPS employees including

Sewing, and by a volunteer from the Santa Fe Rape Crisis Center, SFPS and Sewing received

confirmation from Gregor's students that he excessively touched, tickled, and solicited hugs

from R.P. and C.F.; that he regularly sat with R.P. and C.F. in his lap; kept R.P. alone with him

in his classroom; and that the girls "believed him to be sexually aroused while interacting" with

them. *Id.* at 2127-2130.  Specifically, the students revealed to counselor Helen Nakdimen (now

known as Ruby Rain) that Gregor would hold girls in his lap and tickle them, during which they

felt his "boner," "his thing was sticking up," and it was "nasty!"  *Id.* at 2134.  Defendants are

free to argue to a jury that a report of a child held in her teacher's lap while he maintained an

erection could in no way be construed as describing the teacher's "intentional touching" of the

child's buttocks or "intimate parts," but Defendants cannot show that Dr. Shakeshaft's differing

opinion as to Principal Sewing's duty to report these allegations renders her unqualified.[3]

Likewise, Defendants are free to argue that R.P. and C.F. did not meet the definition of

"abused children" set forth by the Child Abuse and Neglect Act, and to try to convince a jury

that such a conclusion has any relevance at all to the claims at issue here.  But Gregor's

relationship to his students did not prevent the Attorney General's Office from filing felony

criminal charges against him in multiple cases involving young women he taught as

schoolchildren in SFPS and the Espanola Public School District between 2003 and 2009.  *See

State of New Mexico v. Gary F. Gregor,* Nos. D-101-CT-2018-00033, D-117-CR-2017-00336,

D-101-CR-2017-00913, D-101-CR-2018-00033.  He has already been convicted in two of these

cases, and is currently charged with five counts of criminal sexual penetration of a minor (child

---

[3] While Defendants state in passing that Dr. Shakeshaft lacks "knowledge of the law governing
SFPS' duties regarding hiring, investigation, reporting, or training," (Doc. 146 at 11), they
provide no evidence whatsoever of these supposed deficiencies beyond the dubious argument
that Gregor's sexual misconduct in rubbing his erection into his female students did not give rise
to a duty to report on the part of his supervisor, Principal Sewing.

under 13), two counts of criminal sexual contact of a minor (unclothed) (child under 13), one

count of sexual exploitation of children (production) (child under 13), and one count of

kidnapping concerning his abuse of Plaintiff R.P, and with one count of criminal sexual

penetration of a minor (child under 13), and seven counts of criminal sexual contact of a minor

(unclothed) (child under 13) concerning his abuse of Plaintiff C.F.  *See id.*

 Accordingly, because Defendants fail to show that Dr. Shakeshaft is in any way

unqualified to render her expert opinion, which stems naturally and directly out of her education,

training, and considerable professional experience, along with the voluminous facts in the record,

her testimony should be admitted at trial in this matter.

> **D. Dr. Shakeshaft's Expert Opinion is Based on Her Vast Experience and Knowledge, Not Simply Her "Subjective Beliefs"**

 Defendants argue that Dr. Shakeshaft's detailed 52-page expert opinion is not the result

of "any reliable methodology," based on a portion of the opinion at which Dr. Shakeshaft

discusses her expectations for hiring practices in school districts engaged in trying to prevent

sexual predation in schools.  While Defendants do not include the relevant portion of the opinion

in full, it summarizes both Shakeshaft's expectations of such a school district and the numerous

ways in which SFPS' hiring of Gregor fell short of these practices, including SFPS' failure to

seek information regarding Gregor's "criminal background, arrest or conviction" history" and

SFPS' superintendent's admission that the district "didn't always" contact the district where a

candidate last worked.  (Exhibit 1at 2150).  Dr. Shakeshaft then sets forth these expectations of a

responsible district's hiring in three tables – titled *Items to Include on the Application Form,*

*Items to Include in the Screening Process,* and *Items to Include in the Interview of the Candidate*

– and shows how, of the

> 33 desiderata describing educator application, vetting, interviewing and hiring, SFPS
> deployed eight.  There were newspaper accounts of Gregor's arrest and trial in Davis

11

County. The Davis County Schools had records of his alleged misdeeds. Diligent inquiry of his references should have surfaced inconsistencies and/or misgivings. Attention to other employees of his previous school employers would certainly have surfaced the allegations and doubts about his behavior.

(Exhibit 1 at 2152).

Defendants make two criticisms of Dr. Shakeshaft's methodology based on these findings. First, Defendants complain that Dr. Shakeshaft's findings are at odds with the hiring practices urged in her 2004 Congressional Report. (Doc. 146 at 12). Notably, however, Defendants fail to identify the ways in which the responsible hiring practices described by Shakeshaft in 2004 – which were included in the context of a narrative summary to Congress, not in an exhaustive checklist of expectations that one would provide to schools themselves – are materially different from those in her expert report. In point of fact, the 2004 report shows that Dr. Shakeshaft called for an application form that would capture the "applicant's work history, identification that will facilitate background checks, and all information on criminal history" as well as "a statement that incomplete or false information can result in termination. Interviewers should be trained to identify red flags in applicant backgrounds." (Doc 140-74, Exhibit BV at 47). She further called for screening methods including "references, background checks, license information, and application information," noting specifically that, "[t]o make background screens more effective, those who hire should check for gaps in employment, *inquire into reasons for movement between schools or districts, contact school personnel in previous sites reaching beyond those listed as references,* [and] ask direct questions…" – measures that would have revealed Gregor's history of predation in Utah, if they had been undertaken by SFPS here. *See id.* at 48 (emphasis added).

The practices Dr. Shakeshaft generally identified as "likely to reduce educator sexual misconduct" in 2004 are in no way at odds with the expectations set forth in her expert report in

2020.  As set forth in her expert report, Dr. Shakeshaft compared SFPS' deficient hiring practices as applied to Gregor with expected practices including screening that goes "beyond perfunctory reference checks"; an application form that elicits information "about why the candidate left a position and gather[s] contact information on previous supervisors, even if those people aren't included in the reference list"; and an interview in which candidates are "probed about their views on boundaries with children" and "informed of the school's commitment to protecting children from abuse by employees."  (Exhibit 1 at 2150)  In short, her expert report offered the same reasonable expectations for how a school district engaged in trying to prevent sexual predation should conduct its hiring as her Congressional report did in 2004.

    Second, Defendants argue that Dr. Shakeshaft's opinion is unreliable because she does not provide "the source for these model expectations."  (Doc. 146 at 12)  In this way, Defendants seek to liken Dr. Shakeshaft's work as a Professor of Educational Administration to the work of an expert in the hard sciences who cannot support a scientific conclusion with testing data or research material.  Needless to say, the cases on which Defendants attempt to rely are inapposite.  *See U.S. v. Frazier*, 387 F.3d 1244, 1264-65 (11th Cir. 2004) (some testimony of forensic investigator properly excluded after *Daubert* hearing at which investigator offered "precious little in the way of a reliable foundation" for his probabilistic statement that the recovery of hair or seminal fluid "would be expected" in a rape case, and did not indicate whether his opinion was derived from "reliable studies" or his own extremely limited experience, which investigator admitted consisted of "a single investigation he has worked on in which hair evidence was recovered during the investigation of a serial rapist"); *Clark v. Takata Corp.,* 192 F.3d 750, 757-58 (7th Cir. 1999) (mechanical engineer's opinion in auto accident case that properly functioning seat belt would have prevented plaintiff from striking his head on car roof

was properly excluded where expert conceded that he had performed no "testing, reenactments or demonstrations" for either the case at hand or any prior case that formed the basis for his opinion; was unfamiliar with relevant testing performed by anyone else; and had no opinion about the forces that the seat belt and buckle experienced during the accident).

Where the *Daubert* factors do not apply to a given expert's opinion in a "soft science" field, the Advisory Committee to the 2000 Amendments to Rule 702 notes that a court can consider "whether the experts are proposing to testify *about matters growing naturally and directly out of research they have conducted independent of litigation* or whether they have developed their opinions expressly for the purpose of testifying."  *Couture*, 2007 WL 9734358, at *9 (quoting Fed. R. Evid. 702, Advisory Committee Note (2000 Amend.)) (emphasis added). Here, Dr. Shakeshaft's expectations for school districts – which SFPS woefully failed to meet – are the result of "working with school administrators and future school administrators" for the past forty years, in addition to years of experience giving "workshops to school districts and within administrative professional organizations on 'trusted other' sexual misconduct."  (Exhibit 1 at 2118); *see also id.* (Dr. Shakeshaft noting how "[f]or several decades, I have evaluated policies and practices related to the prevention of 'trusted other sexual misconduct'"; "have served as a consultant to schools and professional organizations that serve youth";  have "assist[ed] educational and other youth serving organizations in handling cases involving allegations of 'trusted other' sexual misconduct as well as in developing procedures and policies to prevent misconduct"; and "have provided training and published articles focused on the prevention of 'trusted other' sexual misconduct").  Again, as Defendants themselves note, Dr. Shakeshaft is so firmly established as a leading national expert in this field that she was selected by the Department of Education to author a report to Congress on educator sexual misconduct,

the culmination of a four-year study. *See id.* Her exhaustive research in this area is not only peer-reviewed, it has established "the Standard of Care for the prevention of educator sexual misconduct" that guides schools throughout the nation. *Id.* In sum, Dr. Shakeshaft's work is widely accepted in her field, and her proposed testimony can in no way be reduced to merely her baseless "subjective opinions," as Defendants would have it.

### E. Defendants' Conclusory Rule 403 Argument

Finally, Defendants argue that Dr. Shakeshaft's testimony should be excluded as unfairly prejudicial under Federal Rule of Evidence 403, because of her purportedly inaccurate "characterization of the reported allegations against Defendant Gregor as sexual abuse." (Doc. 146 at 14). As noted above, while Defendants are free to argue to a jury that the graphic allegations his students made against Defendant Gregor to the Santa Fe Rape Crisis Center did not describe "sexual abuse," Dr. Shakeshaft's contrary view is not only admissible, it is supported by decades of experience as the preeminent expert on the subject.

Thus, for the reasons set forth above, Dr. Charol Shakeshaft's expert opinion testimony should be admitted at trial in this matter.

## II. DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERT, BARBARA HAMM, AND SUPPORTING MEMORANDUM (DOC. 147)

### A. Dr. Hamm is an Expert in Psychology Through Knowledge, Skill, Experience, Training and Education

Plaintiffs offer the expert opinion of Dr. Barbara Hamm as to the effect of the long-term grooming and sexual abuse of Plaintiffs on Plaintiffs' behaviors and functioning from childhood through the time of the charged offense to present day. Dr. Hamm is a clinical psychologist, licensed in the state of Massachusetts, and has focused her work on the assessment and treatment of traumatic life events for the last 30 years. (Exhibit 5 at ¶ 4, p. 2) (Report of B. Hamm)). As she explained during her deposition, Dr. Hamm's work "has focused almost entirely on the

impact of interpersonal violence," which Dr. Hamm defines to include physical, sexual and emotional abuse.  (Exhibit 6 at 12:10-13:3 (Deposition of Dr. Hamm)).  More specifically, "the majority of [Dr. Hamm's] work has been with adults who have early histories of child traumas, that have been unresolved, have persisted into adulthood, and then they have been multiply . . . traumatized as adults."  *Id.* at 13:19-14:1.  Dr. Hamm's experience includes working with adults who were sexually abused by schoolteachers.  *Id.* at 14:2-9. In line with her professional concentration, Dr. Hamm describes the focus of her assessment of Plaintiffs in this case as "to describe the psychologically significant factors in their lives and family histories and to evaluate the effect of these factors on their behaviors and functioning from childhood through the time of the charged offense to present day."  (Exhibit 5 at p. 1, ¶ 1).

Dr. Hamm received her Master's in Counseling Psychology from Boston College and a Doctor of Psychology from Massachusetts School of Professional Psychology.  *Id.*  For the past 33 years, Dr. Hamm has been an Instructor of Psychology within the Department of Psychiatry at Harvard Medical school.  *Id.* at ¶ 5.  During this same time period, she has also been a staff psychologist at the Cambridge Health Alliance, primarily with the Victims of Violence Program, "an outpatient adult service providing assessment and treatment for individuals, groups and communities impacted by violence."  *Id.*  Dr. Hamm's *curriculum vitae*, demonstrating her extensive experience in the field, is attached hereto as Exhibit 7.   Dr. Hamm's work with multiple other programs and organizations, in addition to those described above, has also focused on the treatment of victims of various forms of violence.  Dr. Hamm's work as a litigation expert witness has always been secondary to her actual assessment and treatment of adults in the afore-described areas.  She also currently treats patients in private practice.  (Exhibit 6 at 24:2-21).

Defendants take issue with the fact that Plaintiffs' counsel inartfully described Dr. Hamm as an expert in "forensic psychology" within their expert disclosures, who will "render[ ] opinions on her psychosocial evaluations of the Plaintiffs, including review of pertinent materials and interviews of family members."  (Exhibit 8 (Plaintiffs' Notice of Expert Disclosure)).  While Dr. Hamm actually characterizes her expertise as falling within the realm of trauma assessment, rather than forensic psychology, she is eminently qualified to render opinions related to her psychosocial evaluations of Plaintiffs, and, as described in her report, to render opinions in connection with her assessment of the psychologically significant factors in plaintiffs' lives to evaluate the effect of these factors on their behaviors and functioning.  (Exhibit 5 at p., ¶ 1).

While Defendants' psychiatry expert Dr. David Corwin self-identifies as a "forensic psychiatrist," when reduced, his description of the "forensic" aspect of that work is functionally equivalent to Dr. Hamm's description of her work in this case.  Dr. Corwin considers what he does as "really focused in the area of my specialized expertise on trauma, child maltreatment, child abuse" rather than the assessment of "classic forensic psychiatry issues," like the assessment of capacity issues.  Exhibit 9 at 36:1-15; *Id.* 35:22-36:1-4 (Corwin Deposition). In other words, Dr. Corwin considers himself as an expert on trauma, abuse, and maltreatment, which is very similar the self-described concentration of Dr. Hamm's expertise.[4]

Defendants appear to argue that Dr. Hamm is not qualified to "render opinions as to the impact of the alleged sexual abuse on Plaintiff's functioning" because she had never been "qualified as an expert to testify about child sexual abuse or the effects of such abuse on a

---

[4] It is also worth noting that Dr. Corwin's self-characterization as a forensic psychiatrist appears to at least in part be due to the fact that he now only works in the expert witness field, and provides no clinical services to any population, including in the area of trauma assessment.  In fact, Dr. Corwin has not actually treated a patient for the last eight years.  (Exhibit 9 at 7:1-16 (Corwin Deposition)).

person's functioning." (Doc. 147 at 3). This flawed reasoning essentially puts the proverbial

cart before the horse, as the argument suggests that only individuals who get paid for their

opinions, even for opinions rooted in the clinical assessment and treatment of patients, are

qualified to render opinions as experts. Dr. Hamm does not become qualified to render opinions

due to her hiring as an expert, but rather from being an expert in her field. If anything, Dr.

Hamm is *more* qualified to render opinions in this field, as she still provides clinical services

unlike Dr. Corwin, who no longer treats patients.

While Dr. Hamm does not consider herself an expert in "competency or capacity," she is

an expert in the "assessment and treatment of traumatic life events" and the "impact of

interpersonal violence" on a person's life. (Exhibit 5 at p. 2, ¶ 4); (Exhibit 6 at 12:10-13:3).

This includes the evaluation of the effects of traumatic life events and interpersonal violence on

behavior and functioning. (Exhibit 5 at p. 1, ¶ 1). Dr. Hamm's reluctance to characterize her

expertise using this specific terminology does not make her unfit to assess the impact that the

abuse and certain behaviors (including chronic drug abuse) have on Plaintiffs' lives, or her

ability to assess Plaintiffs' ability to manage their affairs or comprehend their legal rights. *See*

*generally Lent v. Employment Sec. Com'n of State of N.M.*, 1982-NMCA-147, ¶¶ 12, 13, 99

N.M. 407, 658 P.2d 1134 (noting that, for purposes of the tolling of a statute of limitations,

courts look to whether the individual is "unable to manage his business affairs or estate, or to

comprehend his legal rights or liabilities" rather than "incompetency to stand trial in a criminal

proceeding, or 'insanity' at the time of commission of a criminal offense," or the diagnosis of a

"mental disorder" as required by the Mental Health Code for commitments, or "with a medical

diagnosis of whether a person is psychotic or has a personality disorder." *See also Does 1-4 v.*

*Espanola Public Schools et al.*, No. CV 17-917 KK/LF, 2019 WL 586661 (D.N.M. Feb. 12,

2019) (identifying as instructive the definition of the term "incapacitated person" within New Mexico's Probate Code, N.M. Stat. Ann. § 38-4-14, as "any person who demonstrates over time either partial or complete functional impairment by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication or other cause, except minority, to the extent that he is unable to manage his personal care or he is unable to manage his property and financial affairs.").

Defendants argue that Dr. Hamm's refusal to characterize herself as an expert in "competency or capacity" signifies a lack of requisite qualification, yet their own expert, Dr. David Corwin, has never been asked to render opinions on capacity in the context of a school sexual abuse case, including in the statute of limitations context.  (Exhibit 9 at 34:2-14; 36:11-19). Again, although he self-describes as a "forensic psychiatrist," Dr. Corwin considers the review of capacity issues as "a classic forensic psychiatry issue" apparently not falling within his own field of expertise as a "forensic psychiatrist." *Id.* 36:1-15; *Id.* 35:22-36:1-4.

> **B.**      **Dr. Hamm's Methodology in Rendering Opinions is Reliable**

In order to formulate opinions in this case, Dr. Hamm met with R.P. for 8 hours, and with her father for 2 hours; and she met with C.F. for 6 hours, with her mother for 2 hours, and with her boyfriend for 2 hours.  (Exhibit 5 at pp. 3-4); (Exhibit 6 at 43:3-44:18). Dr. Hamm also reviewed various records and other case materials, including school documentation of the sexual abuse and investigation, the reports and interviews of students and witnesses, Plaintiffs' responses to written discovery, the operative complaint, the depositions of Plaintiffs and Plaintiffs' family members, as well as other materials.  (Exhibit 5). In addition, Dr. Hamm reviewed multiple texts on childhood development and psychological trauma and recovery as part of her work in the case, including publications considered to be the "gold standard in

understanding psychological trauma . . . rooted in childhood experiences." (Exhibit 6 at 22:8-25). While Dr. Hamm did not record the interviews, she takes notes and is not aware of anything that requires her to record such interviews, and sees it as a personal choice, as she believes it can impact the connection with the interviewee (Exhibit 6 at 53:25-55:4).

At the outset, Defendants' attack on Dr. Hamm's interview-centered methodology as unreliable is unpersuasive.  It is accepted that "[s]ocial science experts commonly base their opinions on interviews." *United States v. Joseph*, 542 F.3d 13, 22 (2d Cir. 2008) (*abrogated on other grounds by Hedgpeth v. Pulido*, 555 U.S. 57 (2008)).  This District has rejected similar challenges, noting that "Rule 703 allows an expert to rely on information gathered during interviews as long as experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Ramah Navajo Sch. Bd., Inc. v. Sebelius*, No. 07 CV 0289 MV, 2013 WL 12303945, at *15–16 (D.N.M. May 9, 2013) (finding unpersuasive attack that college professor and associate social scientist "relied primarily on interviews to collect the information that formed the basis of his opinion," as "Rule 703 allows an expert to rely on information gathered during interviews as long as experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.") (internal quotation marks and citations omitted). Rule 703 allows an expert to base her opinion on any other facts or data, as long as experts in the relevant field would reasonably rely on the facts or data in rendering an opinion on the subject.  Defendants' own expert, Dr. Corwin, considers his interviews with the alleged victims (plaintiffs) "the most important part of what I do forensically in these evaluations."  (Exhibit 9 at 92:10-93:5).

As noted above, in the soft sciences "courts repeatedly have indicated that *Daubert* may not apply at all . . . ." *Couture*, No. CV 05-972 JCH/DJS, 2007 WL 9734358, at *9 (D.N.M. Mar.

28, 2007). The assessment and treatment of traumatic life events using psychosocial evaluations,

cannot be "tested" and the "method" is not capable of peer review, nor can "error rates" be

analyzed. Defendants' expert, Dr. Corwin, perhaps best highlights the issue with viewing

psychological evaluations through a data-driven or scientific lens when he testified in his

deposition that

> a lot of our research is based on what people say. You know, so some of our
> largest, most influential studies are based on what adults later in life, say 50, 60
> years old, say happened to them during childhood. So we don't have --in very
> many studies do we have an independent measure, because we cannot
> experimentally sexually abuse children and compare them to a randomized
> sample that was not sexually abused, which is the standard, the gold standard of
> what medical biological researchers say you have to have to prove causality.

(Exhibit 9 at 95:12--96:18).  Dr. Corwin's deposition testimony also speaks to whether Dr.

Hamm's methodology meets industry standards and is generally accepted as reliable within the

professional community, as Dr. Corwin testified that when he conducts an evaluation he is

"basically falling back upon [ ] training as a physician and, you know, all of that, and the use of

science and knowledge to look at and render an opinion." *Id.* at 174:5-12. While Corwin engaged

a psychologist to conduct psychological testing as a component of his evaluation, it was for an

assessment of "cognitive abilities," *id.* at 160:18-25-162:1-12, which, as clinically defined, are

not the basis for the asserted incapacities in this case.  *See, e.g.*, *Lent*, 1982-NMCA-147, ¶¶ 12

(noting that, for purposes of the tolling of a statute of limitations, New Mexico's courts are "not

concerned with incompetency to stand trial in a criminal proceeding, or 'insanity' at the time of

commission of a criminal offense," nor are they "concerned with the 'mental disorder' required

by the Mental Health Code for commitments," or "with a medical diagnosis of whether a person

is psychotic or has a personality disorder," but rather whether the individual is "unable to

manage his business affairs or estate, or to comprehend his legal rights or liabilities."). *See also*

*Does 1-4 v. Espanola Public Schools et al.*, No. CV 17-917 KK/LF, 2019 WL 586661 (D.N.M.

Feb. 12, 2019) (identifying as instructive the definition of the term "incapacitated person" within

New Mexico's Probate Code, N.M. Stat. Ann. § 38-4-14, as "any person who demonstrates over

time either partial or complete functional impairment by reason of mental illness, mental

deficiency, physical illness or disability, chronic use of drugs, chronic intoxication or other

cause, except minority, to the extent that he is unable to manage his personal care or he is unable

to manage his property and financial affairs.").

    While Defendants strenuously argue that the absence of psychological testing renders Dr.

Hamm's opinions unreliable, their own expert, Dr. Corwin, considers his interviews with the

alleged victims (plaintiffs) "the most important part of what I do forensically in these

evaluations."  (Exhibit 9 at 92:10-93:5).  Dr. Corwin puts the "greatest amounts of weight on that

and what they say."  *Id.* at 93:1-11.  Dr. Corwin went further to say that

> My interview and evaluation is still the most important thing to me.  If the
> psychological testing appears to be off base, I throw it out.  Just like in a clinical
> practice in taking care of patients, if you get a lab test that seems to not fit the rest
> of the picture, you throw it out.

(Exhibit 9 at 173:13-174:4). Thus, Defendant's own expert undercuts the argument that Dr.

Hamm's methodology is somehow unreliable. Defendants attempt to use an article on the

American Psychological Association's (APA) website to say that psychological testing is one of

two "necessary" components to a psychological evaluation, yet nothing within this article so

states.  (Doc. 147, pp. 8-10); (Doc. 140-75).  Rather, the APA indicates within this article that

"tests and other assessment tools" are used to "measure and observe a client's behavior to arrive

at a diagnosis and guide treatment," Doc. 140-75; that a "psychological assessment can include

numerous components such as . . . interview information, school or medical records, . . . and

observational data"; and that the "psychologist determines what information to use based on the

specific questions being asked." (Doc. 140-75). Here, Dr. Hamm used a combination of assessment tools, discussed above, to answer the specific questions posed.

While Defendants argue that Dr. Hamm failed to rule out other traumatic experience as causing trauma, Doc. 147, at p. 12, Dr. Hamm dedicates pages of her report to discussing Plaintiffs' upbringings, family histories, and other traumatic events in their lives. *See* Exhibit 5 at pp. 12-43 (Hamm Report). In fact, Dr. Hamm's consideration of these other sources of trauma is central to her complex trauma analysis, which necessarily considers how childhood traumatic experiences lead to and compound other traumatic experiences, into adulthood. (Exhibit 6 at 107:25-108:24, 20:7-25). It is important to emphasize that these arguments are irrelevant to the capacity challenges presented (where the question is whether the Plaintiffs were incapacitated, not *how* Plaintiffs became incapacitated). To the extent Defendants wish to argue that traumatic experiences separate from Defendant Gregor's sexual grooming and abuse are responsible for Plaintiffs' damages, they are free to do so. Again, any arguments concerning the value to be afforded to an expert's opinion go to the weight, not admissibility of that expert's testimony. *See Compton*, 82 F.3d at 1518 (arguments related to the weaknesses in the underpinnings of the opinion go to the weight and not the admissibility of the testimony). *See also Daubert*, 509 U.S. at 596 (noting that "the traditional and appropriate means" of attacking expert evidence is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof").

Looking to the other relevant "reliability" factors outlined by the Advisory Committee to the 2000 Amendments to Rule 702, while Dr. Hamm has formulated the opinions in this case for purposes of the litigation, the opinions grow from her assessment of the plaintiffs in connection with her years of experience assessing the "impact of interpersonal violence" on the lives of

Plaintiffs.  (Exhibit 6 at 12:10-13:3).  Dr. Hamm has not unjustifiably extrapolated from accepted premises to unfounded conclusions, she has based her conclusions on her extensive interviews of Plaintiffs and the review of relevant records and psychological literature, as she would when treating a patient.  As discussed above, Defendant's own expert applies the very same practices to his formulation of expert opinions.   Dr. Hamm's methodology in rendering opinions in this case is thus reliable.

### C.   Dr. Hamm's Specialized Knowledge Assists the Jury in Understanding the Evidence and Determining Facts in Issue

Dr. Hamm's testimony will not only assist a jury in understanding the evidence, it is crucial to an understanding of the complex psychological ramifications of childhood sexual abuse. These ramifications are not only central to an assessment of Plaintiffs' damages, but also to an understanding of complex trauma histories and how such histories can impact Plaintiffs' functioning and actions into adulthood.  *See generally Martin v. Cavalier Hotel Corp*, 48 F.3d 1343, 1358 (4th Cir. 1995) (district court properly admitted testimony of plaintiff's psychology expert in sexual harassment case about psychological symptoms and personality traits, and why these symptoms were consistent with a victim of sexual assault and made her an easy victim, as the testimony did not go to plaintiff's truthfulness or defendant's guilt).  These concepts are central to an understanding of Defendants' arguments as they relate to the timeliness of these claims. Dr. Hamm testified during her deposition that

> child sexual abuse is really profound. It is -- the body's overstimulated. It's something a child doesn't know how to make sense of. It's intrusive on so many levels, and really disorganizing. That unless a child has a great support system who immediately engages around them and helps that child understand what happened, it will continue to impact them. . . . I don't actually know of anybody who has a history of early childhood sexual abuse, for whom it isn't still a widely engagement in their life. Can they function? Can they work? Some, yes. Can they be successful? Some, yes. But it doesn't mean that it's not still there, and isn't still following in their psychology.

(Exhibit 6 at 110:1-20).  As Dr. Hamm also explains, the abuse history, the corresponding

psychological considerations of denial, complicity, shame, guilt, cognitive dissonance, and self-

agency, among other feelings, all contribute to Plaintiffs' "capacity to understand what they were

experiencing, not only at the time but through the present day."  (Exhibit 5 at ¶¶ 117-124);

(Exhibit 6 at 111:7-116:18).  As Dr. Hamm explained during her deposition, the sexual abuse of

Plaintiffs at such a young age, and the different components of this abuse, which includes being

instructed not to tell anyone what was going on, and the initial enjoyment of special privileges

get "really . . . complicated when those things are tied together, when the perpetrator grooms

somebody, and makes their specialness tied to their complicity in some ways." (Exhibit 6 at

114:8-115:4). The impact of grooming can thus result in long-term loyalty and deeply profound

connections.  *Id.*   The concept of self-agency, also explained by Dr. Hamm and important to the

capacity analysis, relates to the understanding of specific legal rights, and why Plaintiffs may not

have recognized or connected the sexual abuse with any particular legal recourse.  As Dr. Hamm

explains

> Well, there are many possible reasons for that. But this goes back to self-agency,
> to that, in order to think you have legal rights, and that your legal rights have been
> violated, you have to have a sense of who you are, and that you're a person with
> rights. These young women spent a good portion of their teenage years seeking to
> find unconsciousness. Really not to exist.

(Exhibit 6 at 115:23-116:15).  A jury needs this psychological expertise in order to understand

how these sophisticated psychological considerations relate to the issues before them.

Dr. Hamm is an appropriate expert and her opinion, which is based on reliable

methodology, amounts to specialized knowledge that will assist the jury in understanding the

evidence and determining facts in issue. Dr. Hamm's expert opinion testimony should be

admitted at trial in this matter.

### III.   DEFENDANTS' DAUBERT MOTION TO EXCLUDE PLAINTIFFS' EXPERT, MARGARET LANCA, AND SUPPORTING MEMORANDUM (DOC. 148)

Plaintiffs have named Dr. Margaret Lanca as a rebuttal expert in connection with the psychological testing administered and relied upon by Defendants' psychology experts. Dr. Lanca is an Assistant Professor of Psychology in the Department of Psychiatry at Harvard Medical School.  She has been a psychologist in the Department of Psychiatry within Cambridge Health Alliance in Massachusetts for approximately 19 years.  As Defendants do not challenge Dr. Lanca's qualifications to conduct psychological testing or review the results of said testing, Plaintiffs do not detail all of Dr. Lanca's experience and accomplishments herein.  (*See* Doc. 148at 9) (recognizing that, "[i]n fact, Dr. Lanca appears qualified to perform such diagnostic evaluations.").  Dr. Lanca's *curriculum vitae* is attached as Exhibit 10 hereto.

Defendants retained psychologist Dr. Tristyn Wilkerson to conduct psychological testing on Plaintiffs in order to assist Dr. David Corwin in his evaluation of Plaintiffs. Dr. Corwin testified in his deposition that the psychological testing was for an assessment of Plaintiffs' "cognitive abilities," (Exhibit 9 at 160:18-162:12).  Dr. Corwin then used the results of this testing to opine that neither R.P. nor C.F. were incapacitated for purposes of tolling of the statute of limitations, in part because they were both within an average range of intelligence and were not developmentally disabled. (Doc 140-35 at 2(Report of Dr. Corwin re C.F.)); (Doc. 140-34  at 2-3(Report of Dr. Corwin re R.P.))

Plaintiffs retained Dr. Lanca to review the results of Dr. Wilkerson's psychological testing.  Dr. Lanca identified numerous scoring and administration errors which call into question Dr. Wilkerson's, and by extension Dr. Corwin's, conclusions concerning Plaintiffs' cognitive functioning and psychological conditions.  *See* (Exhibit 11 (Report of Dr. M. Lanca)). Dr. Lanca indicates within her report than in "assisting Dr. Corwin's evaluation, it is typical that

a psychologist would provide their assessment of whether these clients had a psychological and or cognitive condition(s) which would contribute to the determination of capacity. In my review of both evaluations, my opinion is that Dr. Wilkerson did not articulate her purpose nor target the assessment in a manner that could adequately answer the above questions." (Exhibit 11 at p. 7). Dr. Lanca opined that Dr. Wilkerson's "conclusions of both [R.P.] and [C.F.] were cursory and incomplete and did not adequately consider the complexity of the psychological data to provide clear interpretations, possible ruling in or ruling out diagnoses, and answer the referral question." (Exhibit 11 at p. 7 (Lanca Report)).

For example, Dr. Lanca identified that while Dr. Wilkerson assessed that C.F. had no significant pathology, including no post-traumatic stress, "on two psychological measures, there were indications that [C.F.] tended to under-report psychological symptoms, and to present herself in an overly positive light. Survivors of childhood trauma sometimes present with shame and guilt about their trauma and consequently can under-endorse items on psychological tests (or clinical interview), particularly if they have not had psychological treatment for trauma, and acknowledgement of the trauma is very emotionally overwhelming." (Exhibit 11 at p. 6).

Also concerning C.F., Dr. Lanca identified that on both the PAI and MCMI-IV tests, C.F. "endorsed the possibility of an alcohol use disorder (past or present) which was not addressed by Dr. Wilkerson in her report; in the history Dr. Wilkerson noted that [C.F.] acknowledged "occasional social drinking." This inconsistency between occasional drinking and a possible alcohol problem raises the question of whether [C.F.] minimized drinking in her history/present during the interview or rather this was not appropriately inquired." *Id.*

Concerning R.P., Dr. Lanca opines that R.P. has "multiple risk factors for cognitive deficits if not a cognitive disorder." (Exhibit 11 at p. 4). The factors include chronic poly-

substance abuse during critical periods of brain development, multiple attempted suicides, and traumatic brain injury from interpersonal violence, among others, that amount to "multiple risk factors for a cognitive disorder," none of which were evaluated. *Id.* pp. 3-4.   Dr. Lanca opines that a "more comprehensive neuropsychological evaluation" was needed in order to "ascertain the full scope of her cognitive functioning."   *Id.*

Defendants make two general arguments in their request to have Dr. Lanca's testimony excluded.  The first is that Dr. Lanca's testimony amounts to inappropriate rebuttal testimony.  The second is that Dr. Lanca's opinions are inadmissible under *Daubert* standards.  Both are addressed in turn below.

### A.   Dr. Lanca is a Proper Rebuttal Witness

A significant portion of Defendants' argument relies on the faulty premise that a psychologist cannot conduct a psychological evaluation without a testing component. Defendants argue that, as psychological testing was a necessary component of any psychological evaluation in this case, Plaintiffs cannot present Dr. Lanca as a rebuttal witness.  Instead, Defendants argue, Plaintiffs were required to retain a psychologist to conduct competing diagnostic testing.  As discussed above in response to Defendants' *Daubert* Motion to Exclude Plaintiff's Expert, Barbara Hamm (Doc. 147) (Part II, above), Plaintiffs do not agree that diagnostic testing was a necessary component to a psychological evaluation in this case; the APA article Defendants rely on as support for this proposition does not support this argument (Part II, pp. 22-23, above); even Defendants' own expert, Dr. Corwin, has testified in this case that testing is not a required component of the evaluation  (Part II, p. 22, above); and diagnostic testing on Plaintiffs' "cognition" is largely irrelevant to the jury's assessment of the evidence in this case or the statute of limitations capacity arguments presented (Part II, pp. 18-19; 21-22, above).

Defendants also argue that Dr. Lanca is an inappropriate rebuttal witness because "a plaintiff is not entitled to present a rebuttal witness just to refute or disprove a defendant's case; rather, a rebuttal witness may be called only if unanticipated and to answer unforeseen arguments presented in the defense case." (Doc. 148 at 4) (citing *Koch v. Koch Ind., Inc.,* 203 F.3d 1202, 1224 (10th Cir. 2000); *Comcoa, Inc. v. NEC Tel., Inc.,* 931 F.2d 655, 664 (10th Cir. 1991)). Again, Plaintiff selected a psychological expert that did not find it necessary to conduct psychological testing in this case in order to formulate her opinions. At the time Plaintiffs made their expert disclosures, it was unknown whether Defendants would retain a psychologist who would conduct psychological testing, and whether the testing would contain scoring or other errors that would need to be addressed through a rebuttal expert. Thus, Plaintiffs disclosed Dr. Lanca to be called as a rebuttal expert "if necessary, based upon her review of the . . . evaluations of R.P. and C.F." Exhibit 8 (Plaintiff's 10-17-19 Expert Disclosures). When Defendants' experts in fact conducted psychological testing, and when Dr. Lanca reviewed Dr. Wilkerson's report and the raw data and determined that the testing contained errors and other defects, it became appropriate for Dr. Lanca to testify as a rebuttal expert on these issues. Plaintiffs accordingly supplemented their disclosures with Dr. Lanca's report. Dr. Lanca is a proper rebuttal witness.

**B.    Dr. Lanca's Opinions are Reliable**

Defendants, as noted above, do not attack Dr. Lanca's qualifications to perform diagnostic evaluations. (*See* Doc. 148 at 9) (recognizing that, "[i]n fact, Dr. Lanca appears qualified to perform such diagnostic evaluations."). Defendants thus presumably agree that Dr. Lanca is also qualified to review another psychologist's diagnostic evaluation for scoring, reporting, and other administration errors.

Defendants argue that Dr. Lanca's opinions are based on the faulty premise that Dr. Wilkerson was "conducting psychological evaluations of Plaintiffs instead of just performing diagnostic testing," and that this misunderstanding renders her related opinions unreliable.  (Doc. 148 at 12).  Dr. Lanca understood Dr. Wilkerson's role in the psychological evaluations conducted, and this is clear from her report.  As Dr. Lanca notes within her report, she reviewed both Dr. Corwin's and Dr. Wilkerson's reports and their depositions.  (Exhibit 11, at p. 1). Dr. Lanca also acknowledges Dr. Wilkerson's role as assisting Dr. Corwin in his larger evaluation of R.P. and C.F. (Exhibit 11, at p. 7).

Specifically, Dr. Lanca indicates within her report that  "[i]n **assisting Dr. Corwin's evaluation**, it is typical that a psychologist would provide their assessment of whether these clients had a psychological and or cognitive condition(s) which would contribute to the determination of capacity."  *Id.* (emphasis added).  As discussed above, Dr. Lanca ultimately opined from her review of these materials, including Dr. Wilkerson's deposition testimony, her expert report, and the raw testing data, that Dr. Wilkerson's "conclusions of both [R.P.] and [C.F.] were cursory and incomplete and did not adequately consider the complexity of the psychological data to provide clear interpretations, possible ruling in or ruling out diagnoses, and answer the referral question."  *Id.* p. 7.

Defendants aim to minimize Dr. Wilkerson's role in the case in order to mask the cursory nature of testing performed.  They explain that "Dr. Wilkerson used diagnostic tests only to assess Plaintiffs' mental status to determine whether Plaintiffs were suffering from any cognitive deficiencies or impairment." (Doc. 148 at 5); *See also id* ("In other words, Dr. Wilkerson only provided insight as to Plaintiffs' level of functioning based on the results of the diagnostic testing.").  As discussed above, Dr. Corwin also narrowly defines Dr. Wilkerson's role in the

30

case as performing psychological testing for an assessment of "cognitive abilities," Exhibit 9 at 160:18-162:12).

In contrast with this minimization of Dr. Wilkerson's role, Dr. Corwin used the results of this superficial testing, which, as Dr. Lanca opines, was altogether insufficient to assess Plaintiffs' overall cognitive functioning and failed to assess the complexity of the testing data and how it contributes to the determination of capacity, in order to bolster his opinion that neither R.P. nor C.F. were incapacitated for purposes of tolling of the statute of limitations. (Doc. 140-35 at 2; Doc. 140-34 at 2-3) (opining that both Plaintiffs were within an average range of intelligence and not developmentally disabled).

Of course, there are other issues with Dr. Corwin's reliance on basic cognitive testing to render this opinion, namely that it is irrelevant to a court's assessment of whether Plaintiffs were able to manage their affairs or comprehend their legal rights for purposes of tolling of the statute of limitations.[5]  But Defendants narrowing of the testing and the analysis of the same to only look to basic cognitive deficiencies, when the scoring actually suggests other psychological or cognitive deficits crucial to understanding the "full scope of cognitive functioning," Exhibit 11 at pp. 3-4, substantially undercuts Defendants' larger opinions rendered concerning capacity issues in this case.

The root of Defendants' concern with Dr. Lanca's testimony is thus not that it is based on an inaccurate understanding of the testing, or that Dr. Lanca's opinions are based on unreliable

---

[5] *See* argument, pp. 19-23, above.  *See also  Lent*, 1982-NMCA-147, ¶¶ 12 (noting that, for purposes of the tolling of a statute of limitations, New Mexico's courts are "not concerned with incompetency to stand trial in a criminal proceeding, or 'insanity' at the time of commission of a criminal offense," nor are they "concerned with the 'mental disorder' required by the Mental Health Code for commitments," or "with a medical diagnosis of whether a person is psychotic or has a personality disorder," but rather whether the individual is "unable to manage his business affairs or estate, or to comprehend his legal rights or liabilities.").

methodology (discussed below).  The root of the concern is that Dr. Lanca's opinions undercut Dr. Corwin's shallow incapacity argument, which relies heavily on Dr. Wilkerson's superficial assessment of Plaintiffs' cognitive abilities.  Defendants' concern is evidenced by the large amount of space dedicated to bolstering Dr. Corwin's credentials and opinions within the motion.  The impact of Dr. Lanca's critique of the testing performed in this case should concern Defendants, as it certainly calls into question Dr. Corwin's ultimate opinions concerning Plaintiffs' incapacity, as they are premised on flawed testing.

Defendants' argument that Dr. Lanca failed to rely on recognized methodology or stated psychological standards is confusing at best.  Dr. Lanca—a psychologist Defendants agree is qualified to administer and score these same tests—reviewed another psychologist's testing, including a review of the battery of tests selected in light of the stated purpose for the testing,[6] for accuracy and reliability.  The tests are scored using standardized protocols and scoring manuals.  Dr. Lanca would rely on the same recognized protocols and test scoring manuals to administer the tests as she did to review them.

Defendants also question the reliability of Dr. Lanca's asserted scoring errors, apparently because she did not quote language from the scoring manuals within her report.  This does not make her opinions concerning these scoring errors unreliable, and Defendants had the opportunity to depose Dr. Lanca in order to explore the intricacies of the scoring of diagnostic testing.  Defendants did not depose Dr. Lanca.  They are, of course, able to address these scoring discrepancies through vigorous cross examination of Dr. Lanca at trial, as these arguments go to

---

[6] While Dr. Wilkerson testified in her deposition that she in part administered a different battery of tests with Plaintiff R.P. than she did with C.F. because of time constraints caused by R.P. failing to appear for the first scheduled evaluation, this does not prevent Dr. Lanca from opining that an equivalent test battery was necessary to adequately assess R.P.'s psychological functioning.  *See* Doc. 148, p. 6.

the weight to be afforded to Dr. Lanca's opinion, not its admissibility.  *See Compton*, 82 F.3d at 1518 (arguments related to the weaknesses in the underpinnings of the opinion go to the weight and not the admissibility of the testimony).  *See also Daubert*, 509 U.S. at 596 (noting that "the traditional and appropriate means" of attacking expert evidence is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof").

Dr. Lanca is an appropriate rebuttal expert and her opinion, which is based on reliable methodology, amounts to specialized knowledge that will assist the jury in understanding the evidence and determining facts in issue. Dr. Lanca's expert opinion testimony should be admitted at trial in this matter.

## CONCLUSION

For all the reasons set forth above, the expert opinion testimony of Plaintiffs' experts, each of whom is eminently qualified in her field, should be admitted at trial in this matter.

Respectfully Submitted,

ROTHSTEIN DONATELLI LLP

*Carolyn M. "Cammie" Nichols 11/3/2020*
CAROLYN M. "CAMMIE" NICHOLS
ALICIA C. LOPEZ
MAGGIE H. LANE
500 Fourth Street NW, Suite 400
Albuquerque, NM 87102
(505) 243-1443
cmnichols@rothsteinlaw.com
alopez@rothsteinlaw.com
mhlane@rothsteinlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF MAILING

I HEREBY CERTIFY that on the 2nd day of November, 2020 I filed the foregoing pleading electronically through the CM/ECF system, which caused counsel for Defendants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

_Carolyn M. "Cammie" Nichols 11/3/2020_
ROTHSTEIN DONATELLI LLP